UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 18-mj-2236-McAliley

UNITED STATES OF AMERICA

vs.

LEWIS RICHARD BENNETT,

    Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __x__ No

                        Respectfully submitted,

                        BENJAMIN G. GREENBERG
                        UNITED STATES ATTORNEY

BY: _____
       EMILY A. ROSE
       Special Assistant United States Attorney
       Court ID No. A5502275
       99 Northeast 4th Street
       Miami, Florida 33132-2111
       Tel: (305) 961-9136
       Fax: (305) 530-7976
       Emily.Rose@usdoj.gov

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>LEWIS RICHARD BENNETT,<br><br>*Defendant(s)* | )<br>)<br>)   Case No.  18-mj-2236-McAliley<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __5/15/2017__ upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, with the county of __Miami-Dade__ in the __Southern__ District of __Florida__ being the District the defendant is arrested, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1111(a) and 7 | Second Degree Murder within the special maritime and territorial jurisdiction of the United States. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

James Kelley, Special Agent/FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __2-16-18__

_____
*Judge's signature*

City and state:  Miami, Florida    Hon. Chris M. McAliley, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, James Kelley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since January 2016. I am currently assigned to the FBI Miami Field Office Violent Crimes and Fugitive Task Force, which targets individuals involved in violent criminal activity and evasion of law enforcement. As part of my duties, I investigate a variety of violations of federal offenses, including Hobbs Act robberies, crimes on the high seas, and other violations of federal law. I received training on the proper investigative techniques for these violations, including the application and execution of arrest and search warrants.

2. The information set forth in this Affidavit comes from my personal involvement in this investigation, as well as from information provided to me by other law enforcement officers. Although I am familiar with the full breadth of the facts and circumstances of this investigation, I have not included in the Affidavit each and every fact known to me about the matters set forth herein, but only those facts and circumstances that I believe are sufficient to establish probable cause that Lewis Richard BENNETT ("BENNETT") knowingly and unlawfully killed Isabella Hellman with malice aforethought within the special maritime and territorial jurisdiction of the United States, in violation of Title 18, United States Code, Section 1111(a).

### PROBABLE CAUSE

3. In the early morning of May 15, 2017, the United States Coast Guard ("USCG") received an Emergency Position-Indicating Radio Beacon ("E-PIRB") and Personal Locator Beacon ("PLB") activation approximately 26 nautical miles west of Cay Sal Bank, Bahamas, upon the high seas and in international waters. BENNETT, a dual citizen of the United Kingdom and

Australia, also dialed and received several calls, including to the USCG, reporting he was in distress in the same general location around the same time.

4. According to initial reports, BENNETT stated that he had been on board an approximately 40-foot catamaran (hereinafter the "VESSEL") with his wife, Isabella Hellman ("Hellman"), a naturalized United States citizen, sailing from Cuba to Florida. BENNETT stated that he had retired to the cabin to sleep on the evening of May 14, 2017, leaving Hellman to operate the VESSEL at the helm. BENNETT claimed that his VESSEL had struck an unknown object on May 15, 2017. BENNETT reported that he moved topside and did not see Hellman on the VESSEL. BENNETT indicated the VESSEL began taking on water, and he deployed his life raft and abandoned ship.

5. A USCG helicopter ultimately rescued BENNETT from his life raft in international waters shortly after 4:00 a.m. and landed at an airport in Marathon, Florida. USCG later retrieved BENNETT's life raft and noticed BENNETT secured a number of personal items in his life raft, including a suitcase and two backpacks. BENNETT chose to only take one pre-packed backpack with him at the time he was rescued by the USCG swimmer.

6. In the following days, USCG ships and air assets searched approximately 4,980 square miles for Hellman. During the search efforts, USCG recovered and transported the VESSEL's life raft and contents to USCG Station Key West, Florida, arriving on May 19, 2017. Prior to being received by the FBI, these items were inventoried in accordance with USCG policy. The items found included, among other items: a suitcase; one backpack; un-expended parachute flares; buoys; fourteen (14) gallons of water; a jar of peanut butter; a secondary EPIRB; a tea set; Cuban trinkets; and nine (9) plastic tubes, wrapped with clear tape containing what were determined to be silver coins.

7. Members of the helicopter, fixed wing plane, and two cutters involved in the search efforts for Hellman all reported that no navigation hazards were observed during the search and rescue efforts, including but not limited to, no shipping containers and no floating or partially submerged objects. Additionally, no other vessels were observed near the area where BENNETT was rescued.

8. On the evening of May 18, 2017, the USCG suspended the search. To date, Hellman, a naturalized United States citizen, has not been located.

9. During the search and rescue operation for Hellman, USCG took video and photographs of the capsized VESSEL. These photographs and video depict two areas, one on each hull, which appear to show that a small portion of each hull was breached. A review of the video and photos of the VESSEL appears to show that the damage to the hull comes from the inside of the VESSEL (based on the spraying of the hull material outward), and is in nearly the same location on both hulls. Based upon interviews of USCG personnel familiar with boating accidents and search and rescue procedures who viewed photographs of the VESSEL, this damage was not catastrophic.

10. The photographs and video of the capsized VESSEL also show that the escape hatches in both hulls of the VESSEL are open. During the course of this investigation, I have learned from VESSEL manufacturer that one of these escape hatch portholes is located in the port and starboard aft cabins of the VESSEL. According to the VESSEL manufacturer and sailing experts, these escape hatches are below the waterline and should never be open while the VESSEL is in the water unless someone is actively escaping through them. Opening these escape hatches would cause water to enter the VESSEL and flood the respective cabin. In a consensual interview with FBI on May 23, 2017, BENNETT never mentioned seeing these portholes in the open

3

position, even though he claimed he was in the port aft cabin of the VESSEL before moving topside and eventually noticing the VESSEL was taking on water.

11. An associate professor of Naval Architecture in the Department of Naval Architecture and Ocean Engineering at the United States Coast Guard Academy agreed to review the evidence collected in this investigation concerning the VESSEL to determine the cause of its capsizing and sinking. The associate professor completed a report that detailed his findings. In those findings, the associate professor stated that "[b]ased on the analysis it does not appear the VESSEL sinking was caused by accidental damage. Rather, it appears the VESSEL was intentionally scuttled." He noted that "[t]he opening of both escape hatches is unexplainable as an accident and defies prudent seamanship." He also noted that "the holes in the hull under the forward hatches are unexplainable as structural failures due to the working of the VESSEL or as a result of a collision....I cannot think of any items that would accidentally cause similar holes in both hulls at roughly the same time."

12. On May 23, 2017, BENNETT was interviewed by law enforcement at his residence in Delray Beach, Florida. BENNETT stated that he and Hellman had begun their voyage on the VESSEL in St. Maarten and had traveled to Puerto Rico and other islands prior to arriving in Cuba. BENNETT stated that on May 14, 2017, after spending the day in Varadero, Cuba with Hellman, they left on the VESSEL bound for Florida. BENNETT stated they departed at approximately 5:30 p.m. and intended to head to either Key West or Fort Lauderdale. BENNETT indicated they had not determined a specific location. BENNETT advised that just prior to retiring for the evening, he set the "auto pilot" on a course heading towards Florida. BENNETT then told Hellman to take the "watch" and wake him if he was needed. According to BENNETT, he then retired below deck for the evening after having dinner at approximately 8:00 p.m.

13. BENNETT claimed that he was next awakened by a "crash underneath" a few hours later. BENNETT stated he then went to the upper deck and Hellman was not there. BENNETT also stated he eventually noticed the VESSEL was taking on water. However, BENNETT indicated that he did not try to locate the source of flooding and did not mention taking any steps to stop the VESSEL from taking on water. BENNETT then said that he began the procedures for abandoning ship. BENNETT stated he gathered his personal belongings into a life raft.

14. BENNETT indicated that he then abandoned the VESSEL and boarded the life raft with his personal belongings approximately 45 minutes to one hour after he woke up. According to USCG and catamaran design and sales personnel, the VESSEL is a type of catamaran that is very seaworthy, and given the sailing training and capabilities of BENNETT, the VESSEL should have been able to stay afloat had initial basic flooding damage control procedures been followed.

15. When asked what efforts he undertook to locate Hellman, BENNETT indicated that he did not do anything. When asked if he used any of the flares on board the life raft to illuminate the area to facilitate a search, BENNETT stated that he did not. When asked if he had yelled for Hellman while in the life raft, BENNETT indicated that he did not. When asked if he attempted to locate Hellman in the water near the VESSEL, BENNETT also stated he did not.[1] In fact, BENNETT stated that once on board the life raft, he cut the line that tethered the life raft to the VESSEL. BENNETT explained that he did this because he was afraid of being pulled under water if the VESSEL were to sink.

16. BENNETT stated that before the USCG rescued him at sea, he utilized a satellite phone to contact Hellman's sister, D.R., and left a voicemail regarding Hellman's disappearance

---

[1] BENNETT has provided several statements during the course of this investigation to several different entities. In other statements, BENNETT stated that he called out for Hellman, threw a Dan buoy in the water to mark the location, and threw a flotation device into the water.

5

at sea. BENNETT then contacted an individual, M.D., in Australia and requested that he contact the USCG. BENNETT provided M.D. with his coordinates at sea. M.D. relayed the information to the USCG. BENNETT then made telephonic contact with USCG while awaiting his rescue.

17. During the course of the investigation, law enforcement learned that BENNETT did not activate his satellite phone and register his PLB until he was in Cuba in mid-May 2017. This was after BENNETT and Hellman had traveled on the VESSEL from St. Maarten to Puerto Rico and from Puerto Rico to Cuba, in early May 2017. Based on my speaking with others familiar with transnational sailing, the voyage from St. Maarten would warrant having an activated satellite phone and registered PLB on board the VESSEL as life-saving devices. Based on knowledge learned during the course of this investigation, the fact that BENNETT waited until the final leg of his voyage to activate those devices is indicative of the fact that he wanted to ensure his own rescue and survival after murdering his wife and intentionally scuttling his catamaran.

18. After his rescue and interviews with agents and officers from FBI and Coast Guard Investigative Service, on or about May 20, 2017, BENNETT purchased one-way airplane tickets for himself and his and Hellman's minor child to the United Kingdom. On or about May 28, 2017, BENNETT flew to the United Kingdom with their minor child, just five (5) days after law enforcement interviewed BENNETT. BENNETT did not inform Hellman's family of their departure.

19. I am also aware that BENNETT is currently litigating the death of Hellman in probate court. On September 20, 2017, BENNETT, through his personal lawyers, filed in Probate Court in Palm Beach County a request for a presumptive death certificate for Hellman. Per Florida statute, a person is presumed dead when they have been absent from their domicile for five (5) years, however, circumstantial evidence of their death can be used to establish the death prior to

the expiration of the five (5) year period. Since Hellman had only been missing for approximately seven (7) months, and a husband would normally want his wife to be found alive, this request is extremely early. I am aware that the Judge overseeing the probate matter noted in open court that this legal action seemed rushed.

20. I have learned that under the laws in the State of Florida, in particular Florida Statute Section 732.102, if Hellman is presumed deceased, the laws pertaining to succession of marital assets would be applicable. Thus, BENNETT would be entitled to the residence Hellman owns in Delray Beach, Florida if Hellman is presumed to be deceased. This would be a monetary incentive, benefiting BENNETT. Further, bank accounts in either the name of Hellman and/or BENNETT would be payable upon Hellman's death to BENNETT.

21. In late August 2017, BENNETT returned to the United States for an insurance interview related to an insurance claim he submitted for the loss of the VESSEL. On August 28, 2017, BENNETT was arrested in the Southern District of Florida for transporting stolen gold and silver coins, valued at $5,000 or more, in interstate and foreign commerce, in violation of Title 18, United States Code, Section 2314. On November 30, 2017, BENNETT was found guilty of this offense, pursuant to his guilty plea. *See* Case No. 17-CR-10025-JLK. BENNETT is currently incarcerated at the Federal Detention Center in Miami, Florida pending his sentencing hearing in Case No. 17-CR-10025-JLK, scheduled on February 20, 2018.

## **CONCLUSION**

22. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that Lewis Richard BENNETT knowingly and unlawfully killed Isabella Hellman with

malice aforethought within the special maritime and territorial jurisdiction of the United States, in violation of Title 18, United States Code, Section 1111(a).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

_____
SPECIAL AGENT JAMES KELLEY
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn before me
this ___ day of February 2018.

_____
HON. CHRIS M. MCALILEY
UNITED STATES MAGISTRATE JUDGE